

B. McKay Mignault, Chief Bankruptcy Judge
United States Bankruptcy Court

**Dated: January 28th, 2025**

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT HUNTINGTON

| | |
|---|---|
| IN RE: | CASE NO. 3:24-bk-30248 |
| SHAWN DERRICK STEVENS and SUZANNE MARIE STEVENS, | CHAPTER 11<br>Subchapter V |
| Debtors. | JUDGE B. MCKAY MIGNAULT |

### MEMORANDUM OPINION AND ORDER OVERRULING
### THE UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' ELIGIBILITY AND
### DESIGNATION UNDER SUBCHAPTER V

Pending before the Court are several pleadings, including briefing ordered by the Court on the 19th day of November 2024 [dkt. 58] regarding whether Mr. and Mrs. Stevens (the "Debtors") are "person[s] engaged in commercial or business activities" pursuant to 11 U.S.C. §§ 101(51D), 1182(1). On December 18, 2024, the Court held a hearing (the "Hearing") regarding:

- the *Objection of Acting United States Trustee to Debtors' Designation and Eligibility under Subchapter V* [dkt. 42] (the "UST's Objection") and its exhibit in support thereof [dkt. 53];

- the Debtors' *Response to Objection of U.S. Trustee to Subchapter V Designation* [dkt. 49] (the "Debtors' Response") and its affidavit in support thereof [dkt. 50] ("Debtors' Affidavit"); and

- the supporting briefs filed by the United States Trustee ("UST") [dkt. 60] (the
  "UST's Brief") and the Debtors [dkt. 66] ("Debtors' Brief").

Counsel for the UST contends that the Debtors are not "engaged in commercial or business activities" because the Debtors were not actively operating or winding down a business when they filed their bankruptcy petition on August 19, 2024 (the "Petition Date"). All, or substantially all, of their businesses' assets were liquidated either before or directly after the Petition Date. The Debtors assert that they held business assets on the Petition Date and were winding down that business. Upon consideration of the parties' filings and arguments as well as relevant case law, the Court concludes that the Debtors were "engaged in commercial or business activities" on the Petition Date as required by 11 U.S.C. §§ 101(51D), 1182(1). For the reasons set forth herein, the UST's Objection is overruled, and this case shall proceed under Subchapter V of Chapter 11.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

1.      The Court is vested with subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      The facts relating to this matter are undisputed.

### A.     CAMBRIDGE DEVELOPMENT, LLC

3.      In 2007, the Debtors formed Cambridge Development, LLC ("Cambridge Development") for the purpose of owning and operating two Bellacino's restaurants located in Barboursville and Kanawha City, West Virginia. The Debtors and Mr. Stevens' father held all membership interests in Cambridge Development.

4.     Cambridge Development is the obligor on a November 5, 2007 Promissory Note in the original principal amount of $345,000.00 with BB&T, which by merger, is now known as Truist (the "Cambridge/Truist Loan").  *See* Proof of Claim #19-1.  The Cambridge/Truist Loan proceeds were used to purchase equipment, improvements, and furniture to operate the Barboursville Bellacino's restaurant.  As security, Mr. Stevens' father granted a deed of trust to a 130-acre farm, and the Debtors granted a first position deed of trust to their residence.  The Debtors also personally guaranteed the loan.

5.     Cambridge Development is also an obligor on a September 2, 2008 Promissory Note in the original principal amount of $150,000.00 to United Bank (the "United Bank Loan").  The United Bank Loan proceeds were used to purchase equipment, improvements, and furniture to operate the Kanawha City Bellacino's restaurant.  As security, the Debtors' father granted a deed of trust in a commercial building located at 2601 8th Avenue, Huntington, WV 25702.  *See In re Cambridge Development, LLC*, Case No. 3:11-bk-30737, *Motion to Lift Automatic Stay*, dkt. 26.  Mr. Stevens also granted a security interest in his excavation equipment.

6.     The Bellacino's restaurants ultimately failed and, as a result, Cambridge Development ceased operations in the summer of 2011.  On December 1, 2011, Cambridge Development sought relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

7.     In that case, Cambridge Development moved to liquidate the restaurant equipment.  This Court granted that relief.  *See In re Cambridge Dev., LLC*, Case No. 3:11-bk-30737, *Order Granting Debtor's Motion to Sell Restaurant Equipment and Authorizing Distribution to Secured Creditors*, dkt. 55.  Subsequently, Mr. Stevens also sold his excavation equipment and those funds were applied to reduce the balance of the United Bank Loan.

8. Simultaneously, United Bank sued Cambridge, the Debtors, and Mr. Stevens' father in the Circuit Court of Cabell County (Case No. 11-C-887) for the remaining balance due on the United Bank Loan. Pursuant to a settlement agreement in that action, the Debtors agreed: (1) to allow United Bank to foreclose upon the commercial building located at 2601 8th Avenue and (2) in exchange for a release of Mr. Stevens' father from all obligations under the United Bank Loan, the Debtors granted United Bank a second position deed of trust on their home.

9. On August 30, 2013, the Court authorized the sale of the 130-acre farm that secured the Cambridge/Truist Loan. *In re Cambridge Dev.*, *LLC*, Case No. 3:11-bk-30737, *Order Granting Debtor's Motion to Sell 130 Acre Farm Free and Clear of Liens to Hold Public Auction on August 31, 2013 and to Employ Auctioneer and Authorizing Distribution of Sale Proceeds*, dkt. 112. An auction was conducted, and those proceeds were applied to the outstanding balance of the Truist Loan.

10. Cambridge Development's bankruptcy case was dismissed on December 26, 2013, after it had liquidated all assets for the benefit of creditors and there were no remaining assets or revenue to support a confirmable Chapter 11 plan or warrant conversion to Chapter 7. *See In re Cambridge Dev., LLC*, Case No. 3:11-bk-30737, *Agreed Order Dismissing Case*, dkt. 119. The case was closed on June 4, 2014.

## B.    LESAGE PROPERTIES, LLC

11. The Debtors formed Lesage Properties, LLC ("Lesage Properties") in November 2006. Lesage Properties owned four properties and operated a real estate leasing business. The Debtors and Mr. Stevens' father owned all membership interests in Lesage Properties.

4

12.    Lesage Properties executed a July 9, 2008 Promissory Note in the original principal amount of $180,000.00 with Truist (the "Lesage/Truist Loan"). *See* Proof of Claim #19-1.   As security, Lesage Properties granted a deed of trust on its four rental properties and the Debtors personally guaranteed the Lesage/Truist Loan.

13.    On November 1, 2011, Lesage Properties' charter was revoked by the West Virginia Office of the Secretary of State due to a failure to file an annual report. *See* UST's Objection, dkt. 53.

14.    Lesage Properties defaulted under the terms of the Lesage/Truist Loan, and Truist accelerated the balance.   On September 27, 2016, Truist sued the Debtors and Lesage Properties for the deficiency balance on the Cambridge/Truist Loan and the Lesage/Truist Loan (collectively, the "Truist Loans"). *See Branch Banking and Trust Co. v. Lesage Props. LLC, et al.*, Case No. 3:16-cv-09161 (S.D. W.Va. 2016).

15.    On January 6, 2017, the United States District Court for the Southern District of West Virginia entered a consent judgment order against the Debtors and Lesage Properties for $406,933.89, along with attorneys' fees and costs of $7,028.85.   That judgment was subsequently recorded in the Cabell County Clerk's Office.

16.    On April 2023, Truist sold and assigned the Truist Loans and judgment to SMS Financial AFC, LLC ("SMS Financial").

17.    Debtors attempted a workout agreement with SMS Financial to reduce their monthly payments.   Debtors also tried to negotiate a consensual resolution with United Bank, asking it to release its second position deed of trust on the residence.   These negotiations failed.

18.     On August 19, 2024, the Debtors filed this bankruptcy case seeking relief under Chapter 11 of the Bankruptcy Code.  On their voluntary petition, the Debtors designated themselves as small business debtors and elected to proceed under Subchapter V.

19.     On the Debtors' Schedules A/B, they claimed a 100% interest in Lesage Properties.  *See* dkt. 1 at 23.

20.     In response to questions 38-41, the Debtors responded "no" to having accounts receivables, office equipment and furnishings, machinery, supplies, and inventory related to the business.  *Id*. at 22–23.  The Debtors also responded "no" to having customer and mailing lists or any other business-related property to questions 43–44.  *Id*.

21.     The "Summary of Your Assets and Liabilities . . ." reflects total liabilities on the Petition Date of $491,252.43.  *Id*. at 15.

22.     Mrs. Stevens is employed as the Director of Special Education Support for the Cabell County Board of Education.  Mr. Stevens is disabled and receives social security income.  *See* Schedule I, dkt. 1 at 51–52.

23.     Neither Schedule I nor J reflect income or expenses associated with Lesage Properties or Cambridge Development.  *Id*. at 51–54.

24.     In the Debtors' Statement of Financial Affairs ("SOFA"), they indicate that they did not receive any income from operating a business, but Mr. Stevens received $28,716.00 in rent collected from Lesage Properties in the three years prior to the Petition Date.  *See* SOFA, dkt. 1 at 56–57.  The Debtors indicate that their debts are not primarily consumer debts.  *Id*.

25.     On August 20, 2024 (the day after the Petition Date), SMS Financial conducted a foreclosure sale of Lesage Properties' only remaining asset: an apartment building.

SMS Financial was the successful bidder, and the proceeds were applied to reduce the Debtors' indebtedness on the Truist Loans.

26.     The meeting of creditors pursuant to 11 U.S.C. § 341 took place on September 26, 2024.  At the meeting, the Debtors testified that they were not currently engaged in business activities.  However, Mr. Stevens stated that the Debtors collected rental payments from the apartment building owned by Lesage Properties until SMS Financial foreclosed upon it.

27.     The UST's Objection was filed on October 16, 2024.  The UST asserts that the Debtors were not "engaged in commercial or business activities," because there are no bank accounts, account receivables, or litigation claims that they can pursue that would result in a distribution to creditors.  *See* UST's Objection.

28.     On November 9 and 12, 2024, the Debtors filed their response and affidavit arguing that they are engaged in commercial or business activities because they were winding down their businesses on the Petition Date.  *See* Debtors' Response and Debtors' Affidavit.

29.     At a hearing held on November 15, 2024, in support of their objection, the UST argued that the Debtors have no assets, and thus cannot be winding down.  The UST asserts that Cambridge Development ceased its operations and Lesage Properties, LLC was administratively dissolved by the Secretary of State in 2011, therefore the timing is too distant from the Petition Date for the Debtors' activities to be considered winding down.  The Debtors reiterated that they are attempting to restructure legacy business debt and, thus, are winding down remaining business obligations.  The Debtors have not expressed an intention to reinstate or operate their businesses in the future.

30.     On November 18, 2024, the Court issued its *Order Requiring Briefing on the United States Trustee's Objection to the Debtors' Designation under Subchapter V* [dkt. 58].

31.     With the briefing complete, the Court took this matter under advisement. This matter is ripe for adjudication.


## II.    ANALYSIS

32.     The Small Business Reorganization Act of 2019 ("SBRA") was enacted on August 23, 2019 and became effective on February 19, 2020.  Pub. L. No. 116-54, 133 Stat. 1079 (2019).  The SBRA introduced a new subchapter V to Chapter 11 of the Bankruptcy Code to eliminate the barriers that small businesses face in the reorganization process.  H.R. REP. NO. 116-171, at 1 (2019); *In re Johnson*, No. 19-42063-ELM, 2021 Bankr. LEXIS 471, at *16, 2021 WL 825156, at *6 (Bankr. N.D. Tex. Mar. 1, 2021) (stating that the purpose of the SBRA is to "allow these debtors to file bankruptcy in a timely, cost-effective manner . . .").

33.     To be eligible as a debtor in Subchapter V, a debtor must meet the definition of a small business debtor under Section 101(51D) and must elect its application.  11 U.S.C. §§ 101(51D), 103(i).  Section 101(51D) provides:

**(51D)** The term "small business debtor"—

(A)     subject to subparagraph (B), means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $3,024,725 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor[.]

11 U.S.C. §§ 101(51D), 1182(1) (stating that the term debtor means a small business debtor.).[1]

34.    Upon the debtor's election to proceed under Subchapter V, the case will continue under this designation "unless and until the court enters an order finding that the debtor's statement is incorrect." Fed. R. Bankr. P. 1020(a).

35.    The United States Trustee or a party in interest may object to the debtor's Subchapter V election. The objection must be filed either within 30 days after the conclusion of the meeting of creditors under Section 341(a) or 30 days after an amendment to the election is filed, whichever date is later. Fed. R. Bankr. P. 1020(b). The UST's Objection was timely filed.

36.    The Debtors bear the burden of proving their eligibility under Subchapter V. *In re Blue*, 630 B.R. 179, 187 (Bankr. M.D.N.C. 2021) (citing *In re Wright*, No. 20-01035-HB, 2020 Bankr. LEXIS 1240, at *5-6, 2020 WL 2193240, at *2 (Bankr. D.S.C. Apr. 27, 2020)); *In re Ikalowych*, 629 B.R. 261, 275 (Bankr. D. Colo. 2021); *NetJets Aviation, Inc. v. RS Air, LLC (In re RS Air, LLC)*, 638 B.R. 403, 414 (B.A.P. 9th Cir. 2022); *In re Offer Space, LLC*, 629 B.R. 299, 304 (Bankr. D. Utah 2021); *but see In re Body Transit, Inc.*, 613 B.R. 400, 409 n. 15 (Bankr. E.D. Pa. 2020) (stating that "[i]t is appropriate to place the burden of proof on [the party in interest], as it is the de facto moving party.").

37.    The requirements that the Debtors must prove to be eligible under Subchapter V are: (1) they meet the definition of a "person" under Section 101(41); (2) they are engaged in commercial or business activities; (3) they do not have an aggregate debt exceeding

---

[1]  The Debtors do not fall under the single asset real estate exclusion because their primary activity is not in the business of owning single asset real estate as their income primarily comes from social security and employment for the Cabell County Board of Education. *See* 11 U.S.C. § 101(51B). The other exclusions enumerated in Section 101(51D) are also inapplicable and not disputed as the Debtors are not "member[s] of a group of affiliated debtors," a "corporation subject to the reporting requirements under 15 U.S.C. §§ 78m, 78o(d), or an "affiliate of a corporation."

the $3,024,725 limit on the Petition Date; and (4) 50% or more of their debts must have arisen

from their commercial or business activities.  *See Ikalowych*, 629 B.R. at 274–75; 11 U.S.C.

§§ 101(51D), 1182(1).  The Court will consider each of these requirements in turn.

38.     The first requirement that the Debtors must satisfy to proceed under

Subchapter V is that they are "persons."  The term "person" includes "individual, partnership, and

corporation . . ."  11 U.S.C. § 101(41).  Here, the Debtors are individual persons, and the Court

finds that the first requirement is met.

39.     The third requirement that the Debtors must satisfy is that their aggregate

debt on the Petition Date does not exceed $3,024,725.00.  Here, the record shows and no parties

dispute that the Debtors' schedules reflect liabilities of $491,252.43 and, therefore, does not exceed

the $3,024,725.00 limit.  *See* UST's Brief.  Therefore, the Court finds that the third requirement

for eligibility is satisfied.

40.     The fourth requirement is that at least 50 or more percent of the Debtors'

liabilities are attributed to commercial or business activities.  Here, 50 percent of their liabilities is

$245,626.22.[2]  Cambridge Development executed a Commercial Promissory Note with United

Bank which required personal guarantees from the Stevens.  According to the schedules, the

amount of that claim is $50,000.00.  Cambridge Development and Lesage Properties both executed

Commercial Promissory Notes with Truist which required personal guarantees.  Truist filed a

---

[2] This figure is derived from the Debtors' schedules.  Looking at the proofs of claim filed, total
liabilities would be $718,404.00, and half of that amount is $359,202.00.  *See In re Jones*, 2013
Bankr. LEXIS 2262, at *10, 2013 WL 2352569, at *3 (Bankr. D.S.C. May 29, 2013) (stating that
"[i]t is appropriate for a court considering eligibility to rely primarily upon a debtor's schedules
and proof of claims," in the Chapter 13 context.); *see also In re Blue*, 630 B.R. at 191 n. 12.  Either
way, the Debtors' commercial and business debts exceed 50 percent of their total debt, and their
total liabilities are below the statutory limit.  This calculation is for eligibility purposes only and
should not be construed as a determination of the allowed amount of any filed claim.

lawsuit against the Debtors and Lesage Properties for the deficiency balance on the Truist Loans, which resulted in a judgment lien. Both the Truist Loans and the judgment lien were assigned to SMS Financial. The amount of this claim according to the schedules is $345,000.00. Other business debts include Huntington Sanitary Board and Petroleum Compensation Board with scheduled claim amounts of $807.31 and $23,785.90 respectively. The total is $419,593.21 in business debts which is substantially more than 50 percent of the Debtors' liabilities, therefore the fourth requirement is satisfied. The parties do not dispute this requirement. *Id.*

41.     The remaining, second requirement is the central dispute between the parties: whether the Debtors are "engaged in commercial or business activities" in accordance with Sections 101(51D) and 1182(1).

42.     The UST asserts that the Debtors are ineligible to proceed under Subchapter V because they are not engaged in commercial or business activities.

43.     The UST argues they are not because, as of the Petition Date, substantially all business assets were sold, and neither Lesage Properties nor Cambridge Development had any bank accounts, outstanding accounts receivables, or were otherwise pursuing litigation that would generate money to their creditors. The Debtors reported no income from operating a business in 2024. The last remaining asset that Lesage Properties owned (an apartment building) was foreclosed upon and liquidated the day after the Petition Date, and Lesage Properties, LLC's charter was revoked by the West Virginia Secretary of State in 2011 for failure to file annual reports. For these reasons, the Debtors are not engaged in ongoing wind down activities in the UST's view. *See* UST's Brief.

44.     In response, the Debtors assert that they were "engaged in commercial or business activities" as of the Petition Date because: (1) they held business assets on the Petition

Date that were subsequently foreclosed upon to reduce the Debtors' liability on business debt owed
to SMS Financial; (2) they collected rent for Lesage Properties until the apartment building was
foreclosed upon postpetition; and (3) they are engaged in wind-down efforts in this case because
they liquidated business assets for the payment of creditors postpetition and are attempting to
resolve personal liability on guarantees of legacy business debt.   Although Lesage Properties'
charter was revoked in 2011, "this fact lends even more support to a finding that the Debtors were
engaged in business since only the members and officers of a [LLC] are authorized to wind up the
affairs of a [LLC] after dissolution."  *See* Debtors' Brief at 7.

45.    The Bankruptcy Code does not define the terms "engaged in" or
"commercial or business activities."  To resolve the dispute over the meaning of this phrase, the
Court starts its analysis "where all such inquiries must begin: with the language of the statute
itself."  *U.S. v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030 (1989).  The plain
language of the statute must be viewed in the overall context of the Bankruptcy Code.  *Offer Space*,
*LLC*, 629 B.R. at 305 (citing *In re Morreale*, 959 F.3d 1002, 1007 (10th Cir. 2020)).

46.    Unless in "rare or exceptional circumstances," the Court must rely on the
plain meaning of the statutory language as conveyed by its common or ordinary meaning.  *United
States v. Chambers*, 985 F.2d 1263, 1267 (4th Cir. 1993).  Dictionaries provide insight as to the
common or ordinary meaning of the text around the time the statute was enacted.  *See Davidson
v. United Auto Credit Corp.*, 65 F.4th 124, 129 (4th Cir. 2023) (citing *United States v. Ward*, 972
F.3d 364, 370 n.4 (4th Cir. 2020)).

47.    According to Merriam Webster Online Dictionary, the term "engaged,"
means to be "involved in activity: occupied, busy."  *Engaged*, MERRIAM-WEBSTER,
https://www.merriam-webster.com/dictionary/engaged#word-history (last visited Jan. 27, 2025).

48.     The term "commerce" is described as "the exchange or buying and selling of commodities on a large-scale involving transportation from place to place." *Commerce*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/commerce (last visited Jan. 27, 2025). *See Commerce*, BLACK'S LAW DICTIONARY (12th ed. 2024) (providing a similar definition).

49.     The term "commercial" is described as "occupied with or engaged in commerce or work intended for commerce," and "viewed with regard to profit." *Commercial*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/commercial (last visited Jan. 27, 2025). *See also Commercial*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining commercial as "of, relating to, or involving the selling of goods or services for profit.").

50.     Business is described as "a usually commercial or mercantile activity engaged in as a means of livelihood: trade, line," or "dealings or transactions especially of an economic nature." *Business*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/business (last visited Jan. 27, 2025). *See Business*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining business as a "commercial enterprise carried on for profit," or a "particular occupation or employment habitually engaged in for livelihood or gain.").

51.     Lastly, "activity" is defined as "the quality or state of being active: behavior or actions of a particular kind," or "a pursuit in which a person is active." *Activity*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/activity (last visited Jan. 27, 2025). *See Activity*, BLACK'S LAW DICTIONARY (12th ed. 2024) (providing a similar definition).

52.     Reviewing the definition for "engaged in," it is in present tense and indicates that the debtor should be currently involved in an activity.  A majority of courts agree with this interpretation and hold that the phrase "engaged in" should be contemporaneous in nature,

and the debtor must show that they were engaged in commercial or business activities on the
petition date to be eligible for Subchapter V relief.  *See Blue*, 630 B.R. at 189;  *In re Thurmon*, 625
B.R. 417, 422 (Bankr. W.D. Mo. 2020) ("'[E]ngaged in' is written not in the past or future but in
the present tense. To add the word 'currently' to the phrase 'engaged in' would be redundant,
because the currency of the involvement or activeness is inherent in the idea of being 'engaged in'
something."); *In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233, 236 (Bankr. S.D. Tex. 2021);
*RS Air, LLC*, 638 B.R. at 410 ("We agree with the majority, that the term 'engaged in' is inherently
contemporary in focus and not retrospective.  Thus, a debtor need not be maintaining its core or
historical operations on the petition date, but it must be 'presently' engaged in some type of
commercial or business activities….").

53.    Considering the phrase "engaged in" within the overall context of the
Bankruptcy Code, similar language appears in other sections of the Bankruptcy Code to ascertain
eligibility for bankruptcy protection in other chapters.  For instance, Sections 101(18A) and (19A)
state that an individual is eligible as a family farmer or fisherman under Chapter 12 if *engaged in*
a farming operation or commercial fishing operation.  11 U.S.C. §§ 101(18A), (19A) (emphasis
added); *see Ikalowych*, 629 B.R. at 281.  Case law has interpreted these sections of the Bankruptcy
Code to require the debtor to be presently engaged in something at the time of filing the bankruptcy
petition.  *In re Rosenberger*, No. 20-50093, 2020 Bankr. LEXIS 2580, at *5, 2020 WL 6940926,
at *2 (Bankr. W.D. Va. Sep. 29, 2020).

54.    The UST argues that "engaged in," means to be currently and actively
involved in commercial or business activities on the Petition Date.  In support, the UST cited to
*Thurmon, Johnson*, and *Rickerson*.  *See Thurmon*, 625 B.R. at 423 (concluding that retired
individual debtors were not engaged in commercial activities because the debtors previously sold

their pharmacy businesses and had no intent to return to them on the petition date.); *In re Johnson*, 2021 Bankr. LEXIS 471, at *22, 2021 WL 825156 at *8 (holding that an individual debtor was not engaged in commercial or business activities when he managed a defunct company and held no stake in another company he worked as a W-2 employee.); *Nat'l Loan Invs., L.P. v. Rickerson (In re Rickerson)*, 636 B.R. 416, 426 (Bankr. W.D. Pa. 2021) (holding that the debtor could not be engaged in commercial or business activities when the companies were completely inactive on the petition date.).

55.    Three courts have held that the debtor does not have to be presently engaged in any commercial or business activity on the petition date, provided the debtor was engaged in such activities in the past.  *See In re Wright*, No. 20-01035-HB, 2020 Bankr. LEXIS 1240, at *7, 2020 WL 2193240, at *3 (Bankr. D.S.C. Apr. 27, 2020) (holding that the SBRA does not limit its application to debtors currently engaged in business or commercial activities); *In re Blanchard*, No. 19-12440, 2020 Bankr. LEXIS 1909, at *7, 2020 WL 4032411, at *2 (Bankr. E.D. La. July 16, 2020); *In re Bonert*, 619 B.R. 248, 255 (Bankr. C.D. Cal. 2020).  These decisions were among the earliest to address this issue, decided within six months after Subchapter V took effect.

56.    The Court agrees with the majority and the UST that "engaged in" is contemporaneous and not retrospective.  Thus, the Debtors must demonstrate that they were engaged in commercial or business activities in some manner on the Petition Date and not merely attempting to restructure legacy business debt.

57.    Turning to the meaning of "commercial or business activities," the Court in *Ikalowych* aptly explained:

> [T]he words "commercial" and "business" are clearly synonyms. But "business" might be just a little bit broader in the sense of encompassing services (in addition to goods) and the idea of earning income through occupation or employment.  As used in Section 1182(1)(A), both "commercial" and "business" modify "activities."

> The word "activities" mainly connotes "actions," "functions," or "processes."  *See*
> WEBSTER'S THIRD NEW INT'L DICTIONARY 22 (G. & C. Merriam Co.
> 1968); *see also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH
> LANGUAGE 17 (Houghton Mifflin Harcourt 5th ed. 2011) (similar).  "Activities"
> is plural.  So, that means more than just one event and suggests continuous,
> recurring, or ongoing action.  Finally, the conjunction "or" in the phrase
> "commercial or business activities," expands the phrase to include as alternatives
> both "commercial activities" and "business activities."

*In re Ikalowych*, 629 B.R. at 278.

58.   What is absent from both the statutory text and the definitions for business,
commercial, and activity is the word "operations."  Operations refers to the "quality or state of
being functional or operative." *Operation*, MERRIAM-WEBSTER, https://www.merriam-
webster.com/dictionary/operation (last visited Jan. 27, 2025).  The term "operation" does not
appear as a synonym for the other words.  The terms "operation" and "engaged in" often appear
together in other eligibility requirements throughout the Bankruptcy Code.  For instance, to be
eligible as a family farmer or fisherman under Chapter 12, a debtor must be engaged in a farming
*operation* or commercial fishing *operation*.  11 U.S.C. §§ 101(18A), (19A) (emphasis added).

59.   In this context, the statute contains similar "engaged in" language, but uses
the broader term "activities" for eligibility to reorganize under Subchapter V instead of the
narrower term "operations" used in other chapters.  This choice is consistent with the notion that
Congress intended relief under Subchapter V to be widely available to debtors regardless of
whether their businesses were operating on the petition date.  *See In re Fama*, 655 B.R. 648, 661
(Bankr. E.D.N.Y. 2023); *Offer Space, LLC*, 629 B.R. at 306 (concluding that operations and
activities are "not interchangeable"); *In re Vertical Mac Constr., LLC*, No. 6:21-bk-01520-LVV,
2021 Bankr. LEXIS 2285, at *9, 2021 WL 3668037, at *3 (Bankr. M.D. Fla. July 23, 2021).

60.   The court in *Thurmon* and the UST suggest that if Congress had intended to
allow all debtors into Subchapter V regardless of business operations, it would have explicitly

stated so. *See Thurmon,* 625 B.R. at 423 ("[I]f Congress had intended to make all debtors with business debts below the debt cap eligible for subchapter V small business relief regardless of whether the business was still operating, it could have done so."). However, the inverse is also true—if Congress intended to limit eligibility to only those businesses that are still actively operating, it would have specifically used the term "operations" as it has elsewhere in the Code.

61.     Courts have taken a variety of approaches when deciphering which activities meet the eligibility requirements for Subchapter V. Some courts narrowly construe "commercial or business activities" to require businesses to be operating on the petition date. Consequently, these courts deny eligibility to debtors whose business operations have ceased. *Thurmon,* 625 B.R. at 423; *In re Johnson*, 2021 Bankr. LEXIS 471, at *22, 2021 WL 825156 at *8; *Rickerson*, 636 B.R. at 426. The UST cites to the abovementioned cases to support their argument.

62.     However, other courts have adopted a "totality of the circumstances" test, which involves scrutinizing the debtor's activities immediately before and after the petition date and examining the debtor's conduct and intent. *See Ikalowych*, 629 B.R. at 283. This standard provides some flexibility and does not demand a "down-to-the-second" review of the debtor's activities on the petition date. Applying this standard, courts have held that a broad spectrum of commercial or business activities allow a debtor to proceed in Subchapter V. *See Offer Space, LLC*, 629 B.R. at 306 (having active bank accounts, account receivables, exploring counterclaims in a lawsuit, winding down, and taking reasonable steps to pay creditors and realize value for its assets qualifies as "commercial or business activities"); *Fama*, 655 B.R. at 669 (addressing residual debt and taking steps to pay creditors are sufficient "commercial or business activities" when the debtor is no longer operating); *Ikalowych*, 629 B.R. at 288 (making financial guarantees

for a company, non-passive ownership of a LLC and receiving income from it, working as a private sector wage earner in an unrelated entity, and winding down were "commercial or business activities"); *Blue*, 630 B.R. at 189 (working as a consultant for an unrelated entity and winding down her former IT business qualified as "commercial or business activities"); *RS Air, LLC*, 638 B.R. at 411–14 (pursuing counterclaims against creditors, negotiating with creditors, filing tax returns, paying taxes, and remaining in good standing with the Secretary of State were sufficient "commercial or business activities"); *Port Arthur Steam Energy, L.P.*, 629 B.R. at 236 (collecting account receivables, pursuing litigation against a third party, and maintaining assets to preserve their value were qualifying commercial or business activities).

63.     This Court agrees with those courts that apply a "totality of the circumstances" standard when assessing whether a debtor was sufficiently engaged in "commercial or business activities" on the Petition Date to qualify for Subchapter V. Consistent with Congress' intent to make Subchapter V widely available to debtors in enacting the SBRA, this standard should be applied broadly to encompass any action of a commercial or business nature.

64.     In this case, the Debtors were 100% owners of two businesses on the Petition Date—Lesage Properties, which was administratively dissolved in 2011, and Cambridge Development, which has not operated since approximately 2011. However, on the Petition Date, the Debtors were responsible for collection of rental payments for an apartment building owned by Lesage Properties (its last asset), which was foreclosed upon the day after the Petition Date. On the Petition Date, the Debtors had no business assets, account receivables, employees, office equipment/furnishings, machinery, supplies, or inventory related to the businesses except for the apartment building which was foreclosed upon the next day.

65.     The record also shows that the Debtors have personal liability for the debts of their businesses, having executed personal guarantees and deeds of trust against their residence to Truist and United Bank that, according to the proofs of claim filed, now encumber their home with liens many times in excess of the value of their $155,000.00 home.  On January 6, 2017, the United States District Court for the Southern District of West Virginia entered a consent judgment in favor of Truist in the amount of $406,933.89, with attorneys' fees and costs of $7,028.85.  That judgment along with the Truist Loans were sold to SMS Financial.  SMS Financial and United Bank filed proofs of claim that collectively total nearly $600,000.00.  The principal debts that the Debtors wish to restructure in their Chapter 11 bankruptcy case are these significant commercial and business debts owed to United Bank and SMS Financial greatly exceed the value of their home.  This Subchapter V case was filed after their attempts to negotiate a consensual resolution with SMS Financial and United Bank failed.

66.     Employing the totality of the circumstances standard with the breadth this Court believes Congress intended, the Court finds that the Debtors were "engaged in commercial or business activities" on the Petition Date.  The Court reaches this conclusion for several reasons.

67.     First, just as the debtor in *In re Blue*, the Debtors' "rental of the real property falls within the broad scope of commercial or business activities contemplated by subchapter V." *Blue*, 630 B.R. at 195.  As the court discussed in *Blue*, the Internal Revenue Code considers the rental of real property to "qualify as a trade or business for tax purposes when there is regular and continuous rental." *Id*.  Here, the Debtors' company had properties that were continuously rented out until the last property was foreclosed upon the day following the Petition Date.  Accordingly, the Court finds that the rental of real property through Lesage Properties as of the Petition Date is a "commercial or business activity" contemplated by Subchapter V.

68.    Second, similar to the debtors in *Ikalowych* and *Robinson*, the Debtors were managing Lesage Properties and winding down that business as of the Petition Date.   It is undisputed that, on the Petition date, there was still a business asset to be liquidated, and that liquidation did occur for the benefit of creditors after the Petition Date.   Liquidation of business assets is undisputedly a wind-down activity.   Moreover, the Debtors are members of Lesage Properties and Cambridge Development, and only members are authorized to wind down the affairs of a LLC upon dissolution.   *See* W. Va. Code § 31B-8-803.

69.    Third, like the debtors in *In re Offer Space* and *In re Fama*, the Debtors were negotiating and taking reasonable steps to pay their creditors holding legacy business debt at the time they filed.   *See Offer Space*, 629 B.R. at 306; *Fama*, 655 B.R. at 669.   The Debtors were engaged in negotiations with SMS Financial to establish a workout agreement prior to filing their bankruptcy petition, and they also had attempted to negotiate with United Bank to obtain a release of its second-position lien on their residence.   Even after these initial negotiations failed, the Debtors have continued to communicate with SMS Financial (*see Agreed Order*, dkt. 83) and United Bank in efforts to restructure these debts, as is clear from the activity on this Court's docket.[3]   The Court is satisfied that the Debtors' ongoing negotiations with SMS Financial and litigation against United Bank constitutes a commercial or business activity.

70.    Courts have concluded that executing personal guarantees is a commercial or business activity.   *See Ikalowych*, 629 B.R. at 288 ("Making financial guarantees for a company in which the [d]ebtor has an indirect equity interest is itself a 'commercial or business activity.'"); *see also Blue*, 630 B.R. at 191 n. 11 ("Guarantying debt can be a sufficient business or commercial

---

[3] The Debtors commenced an adversary proceeding against United Bank on September 18, 2024; a trial is scheduled in this matter on May 23, 2025.

activity.").  As reasoned by the Court in *Ikalowych,* "no one would put millions of dollars of personal guarantees on the line for a company unless it was to advance the guarantor's own commercial and business interests."

71.     Here, the Debtors executed personal guarantees and placed their residence on the line for both Cambridge Development and Lesage Properties to advance their interests in owning Bellacino's restaurants and a real estate leasing company.  The Debtors have a direct equity interest in their companies: they have a 100% interest in both entities.  It is evident that the Debtors must have believed that these companies would succeed and that they would get a return through their ownership and management of the LLCs.  Therefore, the Court finds that the Debtors' continuing obligation on personal guarantees of their defunct companies' business debts on the Petition Date qualifies as sufficient "commercial or business activities" to attain Subchapter V eligibility.

72.     Accordingly, the Court concludes that the Debtors were engaged in "commercial or business activities" on the Petition Date through (1) the rental of real property through Lesage Properties; (2) the liquidation of a business asset postpetition, which is a wind-down business activity; and (3) the engagement in discussions, negotiations, and other efforts to restructure and repay indebtedness under personal guarantees of commercial business debt.

## III.    CONCLUSION

For the reasons set forth herein, the Court concludes that the Debtors have met their burden to show that they are eligible to proceed under Subchapter V.  The Debtors have shown that they are persons engaged in commercial or business activities (as of the Petition Date) whose debts are

less than $3,024,725.00 and more than half of their debts arose from their commercial or business activities.

Accordingly, it is hereby **ORDERED** that:

1.  The UST's Objection is **OVERRULED**.

2.  The Debtors may proceed toward the confirmation of their plan.

**It is so ORDERED.**

The Clerk's Office shall serve a copy of this written opinion and order on the Debtors, Debtors' counsel, and the United States Trustee.